IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

IRENEUSZ ZIEMKIEWICZ,　　　　　　*

　　　　Plaintiff,　　　　　　　　*

　　　　　v.　　　　　　　　　*　　　　Civil Action No. RDB-13-0438

R+L CARRIERS, INC.,　　　　　　*
et al.,
　　　　Defendants.　　　　　　*

*　　*　　*　　*　　*　　*　　*　　*　　*　　*　　*　　*　　*

## MEMORANDUM OPINION

The Plaintiff Ireneusz Ziemkiewicz asserts claims against his former employer Defendant R&L Carriers Shared Services, LLC, and the Defendant R+L Carriers, Inc. (collectively, "Defendants") for defamation, unlawful interference with contract, and unlawful interference with prospective economic benefit, based on allegations that the Defendants falsely represented to prospective employers that he had refused a drug test, making him ineligible to drive a commercial truck under the Federal Motor Carrier Safety Regulations, codified in Title 49 of the Code of Federal Regulations. Pending before this Court are Plaintiff's Motion for Partial Summary Judgment (ECF No. 104), Defendant R+L Carriers, Inc.'s Motion for Summary Judgment (ECF No. 108), and Defendant R&L Carriers Shared Services, LLC's Motion for Summary Judgment (ECF No. 109). Also pending are Defendants' Choice of Law Brief (ECF No. 80) and Plaintiff's Choice of Law Brief (ECF

No. 103) on the issue of punitive damages. A hearing was held on January 27, 2014.[1] *See* Local Rule 105.6 (D. Md. 2011). For the reasons that follow, Plaintiff's Motion for Summary Judgment (ECF No. 104) is DENIED, Defendant R+L Carriers, Inc.'s Motion for Summary Judgment (ECF No. 108) is DENIED, and Defendant R&L Carriers Shared Services, LLC's Motion for Summary Judgment (ECF No. 109) is DENIED. In addition, the issue of punitive damages will be governed by Maryland law. A period of discovery on punitive damages will be set by separate Order.

BACKGROUND

The Plaintiff, Ireneusz Ziemkiewicz, is a Pennsylvania resident who was formerly employed as a commercial truck driver at Defendant R&L Shared Services, LLC's ("Shared Services") Hagerstown, Maryland terminal. Am. Compl. ¶¶1-3, 10, ECF No. 12; Deposition of Ireneusz Ziemkiewicz 73, ECF No. 109-2. Defendant R+L Carriers, Inc. ("Carriers") is a holding company that owns a portion of Shared Services but does not engage in motor carrier operations. Ziemkiewicz, who had been a truck driver for approximately fifteen years, worked for Shared Services for approximately five months from January 2011 through June 17, 2011. Am. Compl. ¶¶ 15, 21-22, 35. He was hired by Shared Services employee Charles Stefaniak, who had recently started work as Terminal Manager at the Hagerstown, Maryland service center. Deposition of Charles Stefaniak 21, 39, 120, ECF No. 109-3. During Ziemkiewicz's employment, Shared Services discovered that although the Plaintiff had listed only one previous accident in his job application, he had been involved in seven

---

[1] For the reasons stated on the record at the hearing, this Court denied the Plaintiff's Motion to Strike Declaration of Daniel Brake, Esq. and R+L Carriers Summary Judgment Reply Brief (ECF No. 132) by separate letter order (ECF No. 135).

total accidents. PX 24 at D000062-64, ECF No. 109-5. Ziemkiewicz was also involved in disciplinary matters during his employment with Shared Services, PX 25 at D000095-97, but his supervisor Stefaniak stated that they had a good working relationship. Stefaniak Dep. 39.

On June 17, 2011, Stefaniak called the Plaintiff to the office for a meeting. According to Stefaniak, the purpose of the meeting was to deliver Ziemkiewicz a written warning for damaging freight and to inform him that he had been selected for a random drug test in accordance with Department of Transportation Regulations. Stefaniak Dep. 23-24, 29-30. At the beginning of the meeting, Stefaniak contends that he had placed a drug test sample cup on his desk. *Id.* at 24, 36. Stefaniak also stated that he had prepared to give Ziemkiewicz the accompanying paperwork for the drug test. *Id.* at 13-14; Pl.'s Exs. L D000035, (Shared Services' internal Random Controlled Substance Test Selection form with Terminal Manager Instructions); Pl.'s Ex. N (Federal Drug Testing Custody and Control Form), ECF No. 104-2. Stefaniak states that Ziemkiewicz saw the cup on the desk and asked if it was for him. Stefaniak testified to then informing Ziemkiewicz that the cup was for his random drug test and that, after discussing the damaged freight incident, Ziemkiewicz would be required to report to Health@Work, the employee clinic. Stefaniak Dep. 24-26, 36-37; Emails of July 1, 2011, Pl.'s Ex. CC, D000036-37, ECF No. 104-2. Stefaniak and Ziemkiewicz then discussed the written warning for the damage to freight. During this conversation, Ziemkiewicz disagreed with the determination that a warning was warranted and resigned his employment. Stefaniak Dep. 22-23. Stefaniak testified that he attempted to calm Ziemkiewicz down and told him that the incident was minor and not worth resigning over. *Id.* Ziemkiewicz turned in his time and fuel cards, and left the office. According to

Stefaniak, Ziemkiewicz did not sign the warning for damaging freight or take the sample cup and drug testing paperwork.  *Id.* at 22-26.

However, Ziemkiewicz's account of the meeting differs significantly from Stefaniak's. Ziemkiewicz flatly denies seeing a sample cup or paperwork and denies that any drug test was mentioned at this meeting.[2]  Ziemkiewicz Dep. 22-23.  He testified that "nobody from [Defendants] asked me about the random.  I am a driver with 15 years' experience and I know what it means [ ] from the driver's side."  *Id.* at 22.  He stated that he "never refused a test" and that he had no reason to do so because he has never taken a drug in his life, and he knew the consequences of a refusal.  *Id.* at 22-23.  Under the Federal Motor Carrier Safety Regulations, 49 C.F.R. § 350, *et seq.* (the "Regulations"), the consequence of refusing a drug screening required by the Department of Transportation ("DOT") is that the employee is deemed to be unqualified to operate a commercial vehicle.  *See also* 49 C.F.R. § 40, *et seq.* ("Procedures for Transportation Workplace Drug and Alcohol Testing Programs").  A refusal is equivalent to a positive test.  49 C.F.R. §§ 40.191, 383.51.  On the other hand, a refusal to take a drug test other than one mandated by the DOT, for example an employer's internal test, carries no regulatory consequences.  *Id.* § 40.191(e).

Later the same day, Stefaniak made handwritten notes of the meeting so that he would not later be accused of terminating the Plaintiff.[3]  Stefaniak Dep. 78; Pl.'s Ex. I, D000027-28, ECF No. 104-2.  It was not immediately apparent to Stefaniak that the Plaintiff's conduct amounted to a refusal of a drug test, and Stefaniak did not report it as

---

[2] No evidence has been presented as to any other witnesses to any aspect of the meeting.
[3] The Plaintiff states his belief that Stefaniak wrote these notes at a later date and pre-dated them to match the date of the meeting.  Pl.'s Opp. 14-15, ECF No. 118-1.

such.  Stefaniak was not knowledgeable about the Regulations, and in his approximately six months as Terminal Manager, he had never had an employee refuse a test.  Stefaniak Dep. 34-35, 116.  The Defendants state that it is not unusual for a Terminal Manager, who is not a Commercial Driver's License holder, to be ignorant of these Regulations, specifically the consequences of a DOT-mandated drug test refusal.  Shared Services' Mot. 6, ECF No. 109-1 (citing Deposition of Dean Kuska 114-15, ECF No. 109-11)).  On the other hand, the Defendants assert that any Commercial Driver's License holder, such as Ziemkiewicz, would be aware of such consequences.  *Id.*  Furthermore, the Defendants asserted at the hearing that employees at the Hagerstown, Maryland terminal would know that only DOT-mandated tests were administered there, as opposed to internal company tests that are not subject to the same Regulations.  Declaration of Sheila Phillips ¶ 3, ECF No. 116-5.

Following the meeting, Penny Foley, a Safety Compliance Coordinator at Shared Services headquarters in Wilmington, Ohio could not locate the results of Ziemkiewicz's scheduled random drug and alcohol screen in the company computer system.  Deposition of Penny Foley 24, ECF No. 109-13; Emails of July 1, 2011, Pl.'s Ex. CC, D000036-37, ECF No. 104-2.  She asked Stefaniak by email if he had the results, and in response, Stefaniak briefly recounted the events of the June 17, 2011 meeting.  Pl.'s Ex. CC, D000036-37.  Based on Stefaniak's reply email, Foley preliminarily determined that Ziemkiewicz had refused a drug test.  Foley Dep. 26.  In order to confirm her interpretation of the events, Foley contacted Sheila Phillips, another Shared Services Safety Compliance Coordinator in the same office.  Phillips Dep. 24; Pl.'s Ex. CC, D000036-37.  Phillips responded with the final decision that the Plaintiff refused the drug test, confirming Foley's conclusion.  Foley Dep.

26; Phillips Dep. 25. Stefaniak took no part in the determination, other than reporting the events of the meeting. Stefaniak Dep. 79.

In a letter to the Plaintiff dated June 30, 2011 and received by the Plaintiff on July 9, 2011, Foley stated that his conduct amounted to a "Positive Drug and/or Alcohol Test Result," and informed him that in order to return to safety-sensitive duty, he would be required to submit to an evaluation and testing by a Department of Transportation Substance Abuse Professional pursuant to 49 C.F.R. § 40 subpt. O. Pl.'s Ex. D, D000051, ECF No. 104-2; Foley Dep. 28-29. Ziemkiewicz contends that he telephoned the Wilmington, Ohio office many times to attempt to challenge to determination that he refused the drug test. Foley Dep. 31-32. Foley informed her supervisor, Gary Moyer, that she was receiving multiple daily calls from Ziemkiewicz regarding the refusal determination. *Id.* 37, 63, 8-9. Moyer told the Plaintiff to stop calling Foley. Ziemkiewicz Dep. 27-30.

As a result of the Plaintiff's challenge to the refusal determination, Shared Services' Human Resources Department, also located in Wilmington, Ohio, further reviewed the matter. Karen Curl, the Director of Human Resources, spoke to Ziemkiewicz and Stefaniak and concluded that the Plaintiff did refuse the drug screen. Deposition of Karen Curl 22, 28, ECF No. 109-15. In particular, she noted that Ziemkiewicz's responses to her questions were "evasive," while Stefaniak's account was "very credible." Curl Dep. 14-15, 51-52, 65. Curl also noted Ziemkiewicz's past performance and credibility issues during his employment with Shared Services, but testified that she found Stefaniak had no motive to lie and that he treated it as a resignation, not a refusal. *Id.* at 52-53, 65. Furthermore, Curl

noted her conclusion that Shared Services had no choice to report the refusal "or else we would be out of compliance." Emails of July 11, 2011, Pl.'s Ex. H, ECF No. 104-2.

Prior to his resignation from Shared Services, the Plaintiff had applied to work at the United Parcel Service ("UPS"). *See* Application of May 12, 2011, UPS000001-02, ECF No. 109-16. By the time he received the June 30, 2011 letter informing him of the positive test, Ziemkiewicz was already employed by UPS. The Plaintiff testified that because he was concerned about the effect of the refusal determination, he showed the letter from Shared Services to his manager at UPS, Michael Schnabel. Ziemkiewicz Dep. 168. Eventually, UPS terminated the Plaintiff on August 31, 2011, stating that he "wasn't living up to the standards that [UPS] set forth." Deposition of Michael Schnabel 21-22, ECF No. 109-17. The manager at UPS testified that the letter regarding the drug test refusal did not play a role in the determination to discharge Ziemkiewicz. *Id.* at 48-49.

The Plaintiff hired a lawyer, who sent Shared Services a letter seeking to "clear up" the matter of the positive test determination. Letter of August 2, 2011 from Thomas Kwiatkowski, Esq., Pl.'s Ex. P, ECF No. 104-2. At that time, the Plaintiff did not file a rebuttal as permitted pursuant to 49 C.F.R. § 391. Karen Curl of the Human Resources Department testified that she forwarded the attorney's letter to Shared Services' legal department. Curl Dep. 35-36. On October 11, 2011 and again on November 2, 2011, the Plaintiff wrote to Foley himself, stating that he had not received documents relating to a drug and alcohol test or a request for a test, and requesting that they be sent to him. Pl.'s Exs. Q-R, ECF No. 104-2. Receiving no response, the Plaintiff then enlisted the help of Department of Transportation ("DOT") Representative Jim Keenan, who demanded on

Ziemkiewicz's behalf that the Defendants provide documentation relating to the refusal determination. Pl.'s Ex. S, ECF No. 104-2. Ultimately, the Defendants produced the requested documents. *Id.*

Subsequently, the Plaintiff applied for employment with other carriers. As part of the applications, he signed release forms giving permission to his former employers to disclose his drug and alcohol testing history. *See, e.g.*, Release Form, NFI000032, ECF No. 109-18. The federal Regulations require former employers to respond to requests for substance screening history from prospective employers. 49 C.F.R. § 391.23(g). In response to such requests, the Defendants sent standardized form reports indicating that Plaintiff refused to submit to a DOT-required random drug test. *See, e.g.*, Pl.'s Ex. A, ECF No. 104-2. The reports stated that they were sent from Shared Services, and were signed by Diana Cline, an administrative assistant employed by Shared Services in Wilmington, Ohio who played no substantive role in the refusal determination or the publication thereof. *Id.*; Curl Decl., ECF No. 116-18. However, Carriers had granted Shared Services the right to use its trademarked brand name, and the reports were printed with a logo reading "R+L® Carriers" across the top. *See, e.g.*, Pl.'s Ex. A, ECF No. 104-2.

The reports, in substantially identical form, were published to several other entities. In July 2011, the Plaintiff applied for work at NFI Interactive Logistics, a carrier in New Jersey, but NFI determined based on Defendants' disclosure of his refusal to take a drug test that he was not qualified for hiring. NFI000054, ECF No. 109-18. Similarly, in September 2011, Defendants informed Black Horse Carriers of the refusal. Pl.'s Ex. B, ECF No. 104-2. Ziemkiewicz's application for employment with Black Horse in Maryland was rejected, but

8

there is no evidence indicating a reason. Deposition of David Schneider, ECF No. 109-21; BH001-04, 14-15, 41-51, ECF No. 109-20. Notably, Ziemkiewicz did not file a rebuttal to the drug screen history report sent to NFI or Black Horse.

Soon after, the Plaintiff applied for a position with Vitran Inc., a motor carrier in Maryland. Ziemkiewicz Dep. 197-98. Ziemkiewicz signed a release form and Vitran requested Ziemkiewicz's drug screening records from Shared Services. VE000012-13, 24-27, ECF No. 109-22. While awaiting a response, Ziemkiewicz was allowed to begin driving for Vitran. On October 21, 2011, Vitran received the form from Shared Services indicating the drug test refusal. At that time, the Plaintiff was on the road actively driving a Vitran truck. Vitran called him and instructed him to pull over immediately so another driver could take his place because the refusal rendered him ineligible to drive. Kuska Dep. 86-87. He was then terminated. VE000002. On November 2, 2011, Ziemkiewicz first filed a rebuttal to charges of failing to take a drug test, after being terminated from Vitran. VE000003.

Ziemkiewicz alleges that as a result of the Defendants' publications of false information, he has been unable to obtain or maintain employment as a commercial truck driver. He specifically alleges that he was terminated from, or prevented from being hired by, UPS, Black Horse, and Vitran in Maryland, and NFI in New Jersey. Ziemkiewicz also suspects that the Defendants' publication of the refusal determination was the reason he was unable to obtain employment from Weiss Brothers, Chopper 79, and Coca Cola, all in Maryland, but he was unable to confirm through discovery that the report was sent to those companies. Pl.'s Mem. 22, ECF No. 104-1. In addition, the Plaintiff received a response from Schneider Trucking in Pennsylvania to his inquiry about possible employment, but he

states that he fears completing the application because of the likelihood that the Defendants will disclose their determination that he refused a DOT-mandated test. *Id.* at 22 n.5.

The Plaintiff initially filed this lawsuit in the United States District Court for the District of New Jersey. He then filed an Amended Complaint, ECF No. 12, asserting three causes of action: I. Defamation; II. Unlawful Interference with Contractual Relations; and III. Unlawful Interference with Prospective Economic Advantage. The Plaintiff alleges that Defendants' statements were knowingly, wilfully, maliciously, and/or recklessly false. He seeks compensatory damages for economic and emotional losses, and punitive damages. Although the District of New Jersey was determined to be a proper venue, the case was *sua sponte* transferred to this Court on February 8, 2013. ECF No. 58.

This Court bifurcated discovery, first allowing discovery as to liability and compensatory damages, with discovery on the issue of punitive damages to follow if necessary after the disposition of summary judgment motions. *See* Mem. Order, ECF No. 86. Following the expiration of the first period of discovery, the parties moved for summary judgment, and filed briefs regarding choice of law on the issue of punitive damages. During the briefing of the pending motions, this Court held a teleconference on October 8, 2013, and granted a further period of discovery into the corporate relationship between Shared Services and Carriers. Finally, this Court held a hearing on the fully briefed motions on January 27, 2014.

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id.* at 249.

When faced with cross-motions for summary judgment, a court "review[s] each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks omitted). In undertaking this inquiry as to each individual motion, this Court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party, *id.*, but only if there is a "*genuine*" dispute as to those facts. *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 519 (4th Cir. 2003) (quoting *Anderson*, 477 U.S. at 247-48 (emphasis in original)).

## ANALYSIS

The parties agree that the controlling law on the issues of liability and compensatory damages is the law of the state in which the publications occurred.[4] *See* Joint Statement

---

[4] This case was transferred *sua sponte* by the United States District Court for the District of New Jersey to this Court pursuant to 28 U.S.C. § 1404(a). Therefore, the parties agree that New Jersey choice of law rules apply. *See* Joint Statement Regarding Choice of Law, ECF No. 91 (citing *Ferens v. John Deere Co.*, 494 U.S. 516, 530-31 (1990); *Amica Mut. Ins. Co. v. Fogel*, 656 F.3d 167, 170-71 (3d Cir. 2011)). Under New Jersey law, "conflict of laws determinations are to be made on an issue by issue basis." *Erny v. Estate of Merola*, 792 A.2d 1208, 1213 (N.J. 2002). The parties disagree on the law controlling punitive damages, which issue is addressed in Part IV of this Memorandum Opinion.

Regarding Choice of Law, ECF No. 91.  Therefore, Maryland law controls Ziemkiewicz's claims with respect to UPS, Vitran, and Black Horse Carriers, while New Jersey law controls the claims relating to NFI carriers.[5]  *Id.*

There is a fundamental disagreement as to the key facts of the meeting on June 17, 2011 between Terminal Manager Charles Stefaniak and Plaintiff Ziemkiewicz.  It is not the province of this Court to make credibility findings when ruling on a motion for summary judgment.  *Meyers v. Balt. Cnty., Md.*, 713 F.3d 723, 730 (4th Cir. 2013).  Based on these diametrically opposed viewpoints, there is more than a metaphysical doubt as to the material facts of this case.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Accordingly, this Court analyzes each Motion based on the version of events advanced by the nonmoving party.  *Rossignol*, 316 F.3d at 523.

## I.     Plaintiff's Motion for Partial Summary Judgment

The Plaintiff moves for judgment as a matter of law as to liability.[6]  Viewing the facts in the light most favorable to the Defendants as the nonmoving party, genuine issues of material fact remain, and the Plaintiff's Motion is accordingly denied.

---

[5] The Plaintiff states that his claim based on his application to Schneider Trucking may require the application of Pennsylvania law on liability and compensatory damages.  Pl.'s Choice of Law Brief 4 n.1, ECF No. 103.  The parties have not specifically briefed issues of Pennsylvania law as to summary judgment.

[6] The Plaintiff raises four issues:  (A) the falsity of the statement that he failed or refused a drug test that was required by the Department of Transportation; (B) that Defendants' liability is not limited under the Federal Motor Carrier Safety Regulations; (C) based on Defendants' spoliation of evidence, Plaintiff is entitled to an adverse jury instruction; and (D) Defendants' defenses of waiver and consent fail as a matter of law.  Issues regarding affirmative defenses are addressed below in the context of the Defendants' Motion for Summary Judgment.

### A. The Refusal Determination

The Plaintiff argues that he is entitled to judgment in his favor because the Defendants' determination that he refused a drug and alcohol test mandated by the Department of Transportation ("DOT") was false as a matter of law. There are two general types of drug and alcohol tests under the Federal Motor Carrier Safety Regulations ("Regulations"): a DOT-mandated test and an employer test. A DOT-required test can only be given in certain circumstances, such as pre-employment, after an accident, or at a random interval. 49 C.F.R. §§ 382.301, 382.303, 382.305. A random drug and alcohol screen must not be announced in advance. 49 C.F.R. § 382.305(k). Rather, the Regulations require that once the employee is selected, he receive notice that the random test is DOT-required, 49 C.F.R. § 382.113, and that he must proceed immediately to the testing site, 49 C.F.R. § 382.305(l). The Regulations also require that the collector who administers the test must use the official Federal Drug Testing Custody and Control Form "to document every urine collection required by the DOT drug testing program." 49 C.F.R. §§ 40.3, 40.45(a). The collector must follow strict procedures in the actual collection of the specimen, including using an individually wrapped, sealed sample cup. 49 C.F.R. § 40.63(c).

Refusing to submit to a DOT-mandated random test is prohibited, and "[n]o employer shall permit a driver who refuses to submit to such tests to perform or continue to perform safety-sensitive functions. 49 C.F.R. § 382.211. Either a refusal or a positive DOT test disqualifies an employee from any safety-sensitive position, including commercial truck driving. 49 C.F.R. §§ 382.211, 382.501. On the other hand, "there are no consequences under DOT agency regulations for refusing to take a non-DOT test." 49 C.F.R. § 40.191(e).

Viewing the facts of the June 17, 2011 meeting in the light most favorable to the Defendants, Ziemkiewicz was selected for a random DOT-required drug test. According to the Defendants, there was a sample cup and testing paperwork on Stefaniak's desk when Ziemkiewicz entered. Ziemkiewicz asked whether the sample cup was for him, and Stefaniak stated that it was. Stefaniak then told Ziemkiewicz to report to Health@Work, the clinic where testing would take place, but not until the meeting regarding the damaged freight was over. For purposes of the Plaintiff's Motion, this Court analyzes the issues upon the above recitation of the facts.

The Plaintiff argues that, under these facts, the Defendants did not inform him that the test at issue was a DOT-required test and he was not instructed to proceed immediately to the test site. In addition, he argues that the Defendants did not follow procedures regarding testing paperwork required by the Regulations and Shared Services internal policies. Specifically, Plaintiff argues that the alleged presence of the sample cup on Stefaniak's desk still did not give Plaintiff notice that he was subject to a DOT-required test.[7] Though the Defendants state that it is standard practice for a manager such as Stefaniak to give the cup to the employee, the Plaintiff argues that only the collector can give the employee the testing cup. Defs.' Opp. 5, ECF No. 116; Pl.'s Mem. 14, ECF No. 104-1. Furthermore, the Plaintiff contends that Stefaniak did not follow the instructions in the internal Random Controlled Substance Test Selection Form, and that the Chain of Custody Form used by Defendants is not an official Federal Drug Testing Custody and Control Form

---

[7] Ziemkiewicz previously argued that the Defendants used the wrong type of sample cup for a random DOT test, but later acknowledged that the exact type of urine cup is immaterial to the pending motions. Pl.'s Reply 9-11, ECF No. 126.

as set forth in 49 C.F.R. § 40.45(a). Therefore, Ziemkiewicz argues that any test was not DOT-mandated and there should have been no consequences for his alleged refusal pursuant to 49 C.F.R. § 40.191(e).

There is a genuine issue of material fact as to whether the Plaintiff refused a DOT-mandated drug and alcohol screen. Pursuant to the Regulations, there are no specific words that an employer must say in order to provide notice that a test is required by the DOT or that the employee must proceed to the testing facility immediately. Likewise, the Regulations do not specifically mandate the timing of the notice, the use of forms by the employer (as opposed to the collector), or whether the employer is allowed to distribute the testing sample cup. 49 C.F.R. § 382.113; Deposition of Pl.'s Expert Donna Rae Smith 112-20, ECF No. 116-3. Rather, the evidence indicates that Ziemkiewicz, as a Commercial Driver's License holder, was knowledgeable about this particular Regulation, especially in light of the immense consequences a refusal can have on employability as a commercial truck driver. Ziemkiewicz Dep. 22-23. The Defendants have also provided evidence that Shared Services only administered DOT-mandated tests, a fact that may have been known to the drivers at the Hagerstown facility, including the Plaintiff. Finally, as a matter of public policy, it would skirt the intent of the Regulation to allow a driver to effectively refuse a test without consequences by resigning from employment immediately upon learning that a test was imminent. Thus, it is possible to "refuse" a drug screen under the Regulations before the employer gives explicit notice that the test is DOT-mandated if the employee has actual notice from the employer by other means. In the light most favorable to the Defendants, a reasonable finder of fact could conclude that Ziemkiewicz was randomly selected for a test

and that he knew of his selection. A reasonable inference from such a finding would be that the Defendants properly determined that Ziemkiewicz refused a DOT-required random drug test. In turn, the reports sent in response to other employers' background checks would also be truthful, defeating the Plaintiff's claims. Accordingly, summary judgment is inappropriate because there remains a genuine issue of material fact as to whether the determination that Ziemkiewicz refused a drug test required by the Department of Transportation was false. The Plaintiff's Motion is denied as to that issue.

### B. Limitation of Liability Under the Federal Motor Carrier Safety Regulations

The Plaintiff next argues that he is entitled to judgment as a matter of law because the Defendants' liability is not limited by the Regulations. The Regulations generally bar suits for defamation or interference with a contract based on employers' communication of DOT drug testing information.[8] 49 C.F.R. § 391.23(l)(1); *see also* 49 U.S.C. § 508. This immunity does not apply, however, to employers who "knowingly furnish false information, or who are not in compliance with the procedures specified for these investigations." 49 C.F.R. § 391.23(l)(2). Among the procedures set forth in the Regulations is the requirement that employers keep records of testing information given to prospective employers for one year. 49 C.F.R. § 391.23(g). Additionally, an employee may challenge the employer's determination and file a rebuttal statement that must be included with the former employer's report to prospective employers. 49 C.F.R. § 391(i)-(j). Employers must afford a subject employee "a reasonable opportunity to review and comment on the records," 42 U.S.C. §

---

[8] The limitation of liability provision does not explicitly apply to tortious interference with prospective economic advantage, as opposed to interference with contract. 49 C.F.R. § 391.23(l).

508(b)(2)(A), and must respond to an employee challenges within fifteen days, 49 C.F.R. §

391.23(j)(2).

First, as discussed above, the Plaintiff cannot at this stage prove as a matter of law

that the Defendants provided false information, knowingly or otherwise, regarding his drug

and alcohol testing history. Therefore, the Defendants do not automatically lose the

protections of Section 391.23(l)(1). As to the requirement that employers preserve testing

records that are reported to other companies for one year, 49 C.F.R. § 391.23(g)(4), the

Defendants admit that they failed to comply with the Regulation as to the records sent to

certain prospective employers. ECF No. Defs.' Opp. 17, ECF No. 116. The Defendants

urge, however, that a violation of this ancillary record-keeping requirement should not strip

them of the protections of the Regulations. In support of this contention, the Defendants

cite the public policy of encouraging safety in motor carrier operations underlying the

limitation of liability for former employers to report substance testing history. The Federal

Motor Carrier Safety Administration, an administration of the Department of

Transportation, is tasked with "the assignment and maintenance of safety as the highest

priority, recognizing the clear intent, encouragement, and dedication of Congress to the

furtherance of the highest degree of safety in motor carrier transportation."[9] 49 U.S.C. §

113(b). The implementing Regulations applicable in this case are in furtherance of that aim.

---

[9] In the recent decision in *Air Wisconsin Airlines Corp. v. Hoeper*, the Supreme Court recognized the public policy underlying similar immunity for reporting material safety information in the context of airline safety. 571 U.S. ___ , No. 12-315, slip op. at 9, 2014 WL 273239 (2014) (analyzing the Aviation and Transportation Security Act (ATSA), 49 U.S.C. § 44901, *et seq.*). In holding that the immunity applied to the allegedly defamatory statement in question, the Supreme Court noted that "Congress wanted to ensure that air carriers and their employees would not hesitate to provide the [Transportation Security Administration] with the information it needed." *Id.* The statutes and regulations at issue in this case evince similar Congressional intent to encourage undeterred and accurate reporting.

49 C.F.R. § 1.86(a) (Federal Motor Carrier Safety Administration is responsible for promulgating and enforcing regulations relating to motor carrier safety). In light of the overriding safety concerns that justify the reporting requirement in the first instance, this Court concludes that the mere failure to preserve those reports for one year, in the absence of any prejudice to the employee, does not strip former employers of the limitation of liability afforded by the Regulations.

Even so, the question remains whether, as a result of that failure to preserve the records along with the other circumstances of the refusal determination and subsequent reporting of the drug test history to prospective employers, the Defendants were "not in compliance with the procedures specified for these investigations." 49 C.F.R. § 391.23(l)(2). The dispute procedure for refusal determinations requires the employer to respond to an employee's challenge and give the employee access to the relevant records. 49 C.F.R. § 391.23(i)-(j). Following Ziemkiewicz's resignation, Shared Services employees had extensive communication with him, and he had access to the content of the substantially identical reports. Ziemkiewicz Dep. 27-30; Foley Dep. 37, 63, 8-9. Shared Services employees notified the Plaintiff that they considered his conduct a refusal and that the reports would not be withdrawn. Foley Dep. 37. Although at a certain point, the Defendants did not further respond to the Plaintiff's repeated submissions regarding the same incident, it is not clear that the regulations require that an employer respond to each of multiple requests to revise the same refusal determination. 49 C.F.R. § 391.23(j)(2). The Plaintiff also never filed a rebuttal statement to be sent to prospective employers until after he was already terminated from Vitran. Although the Plaintiff was not satisfied with the ultimate determination, given

the extensive contacts between Ziemkiewicz and Shared Services employees about this situation, there is a genuine issue of material fact as to whether the Defendants complied with the employee challenge and dispute resolution aspects of the Regulations. In sum, the Plaintiff is not entitled to judgment as a matter of law because the Defendants may be protected by regulatory and statutory limitations on liability.

### C. Spoliation

The Plaintiff further argues that because of the Defendants' failure to preserve records pursuant to 49 C.F.R. § 391.23(g)(4), they are guilty of spoliation.[10] On that basis, the Plaintiff requests an adverse jury instruction to the effect that the Plaintiff's inability to obtain employment in Maryland at Weiss Brothers, Chopper 79, and Coca Cola, was a result of the Defendants' conduct. Pl.'s Mem. 22, ECF No. 104-1. Because the Plaintiff has not met his burden to show that such a drastic sanction is warranted, his Motion for spoliation sanctions is denied.

As this Court has previously noted, "[s]poliation is the destruction or material alteration of evidence or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Goodman v. Praxair Servs., Inc.*, 632 F. Supp. 2d 494, 505 (D. Md. 2009) (citations and internal quotation marks omitted). A party seeking spoliation sanctions must prove the following elements:

> (1) [T]he party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a "culpable state of mind;" and (3) the evidence that was

---

[10] After the hearing, without leave of Court, the Plaintiff filed a Supplemental Letter, ECF No. 136, in which he re-argues the points in his Motion, ECF No. 104-1, and Reply, ECF No. 126. Although the Letter is not called for by the Federal Rules of Civil Procedure or otherwise, this Court has considered it and the Defendants' Response thereto, ECF No. 138.

> destroyed or altered was "relevant" to the claims or defenses of the party that sought the discovery of the spoliated evidence, to the extent that a reasonable factfinder could conclude that the lost evidence would have supported the claims or defenses of the party that sought it.

*Id.* at 509. First, the Plaintiff's spoliation Motion is untimely. "[T]here is a particular need for these motions to be filed as soon as reasonably possible after discovery of the facts that underlie the motion." *Id.* at 508. Moving for spoliation sanctions as part of a motion for summary judgment, when discovery has closed and been reopened for an additional period, is not "as soon as reasonably possible." *Id.* at 508-09.

Moreover, in this case, failing to keep the records at issue was not spoliation. The duty arose upon receipt of the letter sent by Ziemkiewicz's former lawyer on August 2, 2011 to "clear up" the refusal determination. *See* Curl Dep. 35-36 (testifying that she would have sent the letter from Ziemkiewicz's attorney "straight to legal"). However, regardless of when the duty arose, the Plaintiff cannot show that the Defendants acted with a culpable state of mind or that the records would have been relevant to his claims. There is no evidence in the record indicating that the reports were not preserved as a result of anything other than negligence. Likewise, the Defendants had no duty to request that other businesses preserve the drug screen history notices. Although the companies to whom the reports may have been sent did not preserve them, the prospective employers could still shed light on why Ziemkiewicz was not hired or was fired. The Plaintiff had the ability in discovery to inquire of each company to whom he applied why he was not hired. Because there has been an ample opportunity for the Plaintiff to discover evidence as to the alleged effects of the drug and alcohol screen history reports, his request for the extraordinary remedy of an adverse jury instruction as to causation is denied.

The Plaintiff argues in the alternative that the Defendants should be stripped of their privilege under the Regulations for reporting drug and alcohol testing history as a spoliation sanction. As discussed above in Part I.B, the Plaintiff cites no authority for stripping the Defendants' privilege under Part 391.23(l) because of a technical violation of record-keeping requirements to preserve the records for one year, in the absence of prejudice. Likewise, he cites no authority for the proposition that a violation of a federal Regulation would automatically strip a defendant of a state common law privilege.

In this case, the federal and state privileges can independently exist side by side. *See Specialized Carriers & Rigging Ass'n v. Virginia*, 795 F.2d 1152, 1155-56 (4th Cir. 1986) (field of motor carrier safety is not preempted by federal regulations). In *Specialized Carriers & Rigging Association*, the Fourth Circuit also recognized that the Regulations do not preempt state law by conflict unless state and federal laws are incompatible, or state laws would decrease highway safety. *Id.* at 1158. In this case, the state law privileges at issue are compatible with 49 C.F.R. § 391.23(l) and 49 U.S.C. § 508, and therefore do not raise a conflict preemption issue. *See* 49 U.S.C. § 508(c) (expressly preempting state or local laws that impede the furnishing of safety information). Indeed, courts have applied the privilege under the Regulations along with other statutory and common law privileges in the same case. *Dickens v. Werner Enters.*, No. 1:12CV76, 2012 U.S. Dist. LEXIS 103850, at *8-10 (N.D. W. Va. July 26, 2012) (holding that defendant is free to claim protections of 49 C.F.R. § 391.23(l) and West Virginia common law privilege for former employer reports to prospective employers), *report and recommendation adopted in part*, 2012 U.S. Dist. LEXIS 145618 (N.D. W. Va. Oct. 10, 2012) (allowing plaintiff to file more definite statement of malice to overcome qualified

privileges); *see also Miller v. J.B. Hunt Transp., Inc.*, No. 13AP-162, 2013 WL 4807036, at *6-7 (Ohio Ct. App. Sept. 10, 2013) (analyzing the applicability of 49 C.F.R. § 391.23(l) and state statutory and common law qualified privileges).

Thus, each separate privilege is a separate issue. Genuine issues of material fact remain as to whether the Defendants are entitled to the protections of each of the privileges, or whether the Plaintiff can overcome those privileges with sufficient evidence of Defendants' knowing misconduct. Accordingly, the Plaintiff's Motion for spoliation sanctions is denied.

## II.    Defendant R&L Carriers Shared Services, LLC's Motion for Summary Judgment

Defendant R&L Carriers Shared Services, LLC ("Shared Services") moves for summary judgment on the basis that, even if the facts are viewed in the light most favorable to the Plaintiff, his claims are barred as a matter of law. Defendant R+L Carriers, Inc. ("Carriers") joins this Motion and also moves for summary judgment on separate grounds. Carriers' Mot. 11 n.4, ECF No. 108-1. The Defendants argue that even if the fact finder concluded that Stefaniak never told Ziemkiewicz that he was selected for a random a drug test, the Defendants are entitled to judgment as a matter of law because Stefaniak did not make the refusal determination or the allegedly defamatory publications. The Defendants further argue that the defenses of waiver, release, and consent bar the Plaintiff's claims. Finally, the Defendants move for summary judgment on the issue of causation as to several of Ziemkiewicz's claims as they relate to specific publications of the drug screen history reports.

### A. Defamation Claims

The Defendants move for summary judgment as a matter of law on Count I, arguing that Ziemkiewicz cannot show the malice or intentional misconduct required to sustain a defamation claim under either Maryland or New Jersey law.

#### 1. Maryland Defamation Claims

The Plaintiff's claims based on publications made to UPS, Vitran, and Black Horse are governed by Maryland law.[11] To sustain a defamation claim, Maryland law requires a showing that: "(1) the defendant made a defamatory communication to a third person; (2) that the statement was false; (3) that the defendant was at fault in communicating the statement; and (4) that the plaintiff suffered harm." *Samuels v. Tschechtelin*, 763 A.2d 209, 241-42 (Md. Ct. Spec. App. 2000); *S. Volkswagen, Inc. v. Centrix Fin., LLC*, 357 F. Supp. 2d 837, 843 (D. Md. 2005). Although "fault" is generally determined under a negligence standard, where a defendant "publishes a statement in furtherance of his own legitimate interests, or those shared in common with the recipient or third parties, or where his declaration would be of interest to the public in general," a conditional privilege applies. *Klingshirn v. Fid. & Guar. Life Ins. Co.*, No. RDB-12-00542, 2013 U.S. Dist. LEXIS 119868, at *13 (D. Md. Aug. 22, 2013); *see also Bagwell v. Peninsula Regional Med. Ctr.*, 665 A.2d 297, 317 (Md. Ct. Spec. App. 1995) (employer's character reference statements about former employee to prospective employer subject to qualified privilege). As this Court has noted, whether this conditional

---

[11] The parties agree that, according to New Jersey choice of law rules, liability and compensatory damages in this case are governed by the law of the place of alleged publication. Joint Statement Regarding Choice of Law, ECF No. 91.

privilege exists is a question of law. *Klingshirn*, 2013 U.S. Dist. LEXIS 119868, at *22; *Bagwell*, 665 A.2d at 318.

If the privilege applies, a plaintiff must show that the defendant acted with malice to overcome it. *Bagwell*, 665 A.2d at 318; *Gohari v. Darvish*, 767 A.2d 321, 328 (Md. 2001) (to overcome conditional privilege, plaintiff must show that (1) the publication [was] made with malice, that is, with knowledge of falsity or reckless disregard for the truth; (2) the statement was not made in furtherance of the interest for which the privilege exists; (3) the statement is made to a third person other than one whose hearing is reasonably believed to be necessary or useful to the protection of the interest; and (4) the statement includes defamatory matter not reasonably believed to be in line with the purpose for which the privilege was granted). "[I]n the context of the employer-employee relationship, statements made to prospective employers or upon request by industry regulatory authorities fall under a qualified privilege if the employer was acting in good faith. . . . In that context, there is a legal presumption that the employer is acting in good faith absent a showing by 'clear and convincing evidence' that the employer acted with actual malice or intentionally or recklessly disclosed false information about the employee." *Hermina v. Safeway, Inc.*, No. WMN-11-1523, 2012 WL 12759, at *6 (D. Md. Jan. 3, 2012) (citing Md. Code Ann., Cts. & Jud. Proc. §§ 5-423(a)-(b)).

In this case, the purpose of the Federal Motor Carrier Safety Regulations' reporting requirements is the safety of commercial trucking, which is undoubtedly a matter of great public concern. In addition, because the communications were made to prospective employers in the context of the employer-employee relationship, there is a presumption that the Defendants acted in good faith. *Hermina*, 2012 WL 12759, at *6; *Bagwell*, 665 A.2d at

317.  Accordingly, the Maryland law on conditional privilege applies to this case and the Plaintiff must show malice by clear and convincing evidence to succeed on his claims.  When viewing the facts in the light most favorable to the Plaintiff as the nonmoving party, a drug screen was never mentioned at the June 17, 2011 meeting.  Thus, a reasonable finder of fact could conclude that Stefaniak acted with reckless disregard for, or actual knowledge of, the falsity of his statements that the Plaintiff was informed that he had been randomly selected for a drug and alcohol test.  The Plaintiff may be able to show by clear and convincing evidence that the Defendants acted with the level of malice necessary to overcome the qualified privilege.

The Defendants argue that their liability cannot be based on Stefaniak's conduct, but should only be judged by the actions of the Shared Services employees in Ohio who made the refusal determination and published the drug screen history reports.  This argument fails based on the doctrine of *respondeat superior*, under which "an employee's tortious conduct is the 'legal act' of the employer."  *Fid. First Home Mortg. Co. v. Williams*, 56 A.3d 501, 520-21 (Md. Ct. Spec. App. 2012) (quoting *Embrey v. Holly*, 442 A.2d 966, 970 (Md. 1982) (analyzing malice for punitive damages purposes)).  "The employer is thus deemed to be 'at fault' for the employee's conduct."  *Id.*  Although Stefaniak, the Manager of the Hagerstown, Maryland terminal, did not make the refusal determination or publish the allegedly defamatory letters to other trucking companies, his statements made in the scope of his employment are imputed to his employer.  *Id.*  Those statements provide the basis for this action.  The refusal determination made by Compliance Manager Phillips and confirmed by Human Resources Manager Curl, and in turn, the reports of the refusal to Ziemkiewicz's

prospective employers, were based on Stefaniak's statements.[12]  If it is determined by the jury at trial that the drug screen reports were based on reckless or knowing falsehoods, the conclusion may follow that those publications were not made in furtherance of the interests of safety, but out of malicious intent.[13]  Therefore, the Defendants' Motion is denied as to the Maryland law defamation claims because a reasonable jury could conclude by clear and convincing evidence that the Defendants acted with the malice required to overcome any privilege that applies.

## 2. New Jersey Defamation Claim

The Plaintiff's claim based on publication to NFI is governed by New Jersey law. New Jersey law requires the following elements for a claim of defamation: "(1) the assertion of a false and defamatory statement concerning another; (2) the unprivileged publication of that statement to a third party; and (3) fault amounting at least to negligence by the publisher."  *DeAngelis v. Hill*, 847 A.2d 1261, 1267-68 (N.J. 2004) (citing Restatement (Second) of Torts § 558 (1977)).  If the matter is of legitimate public concern, even if the person is a non-public figure, the law requires proving actual malice by clear and convincing evidence.  *Turf Lawnmower Repair v. Bergen Record Corp.*, 655 A.2d 417, 426-28, 433 (N.J. 1995) (noting New Jersey's jurisprudence going beyond the "public figure" analysis of *Gertz v. Welch*, 418 U.S. 323, 333 (1974)).  Whether a matter is of public concern is a question of law

---

[12] If the reports of the Plaintiff's refusal are indeed false, they are defamatory per se because they automatically disqualify him from working as a commercial truck driver.  *Klingshirn v. Fid. & Guar. Life Ins. Co.*, No. RDB-12-0542, (D. Md. Aug. 22, 2013) ("[A] statement is defamatory per se when if true, it would disqualify an individual or render him less fit properly to fulfill the duties incident to the special character assumed.") (quoting *Leese v. Balt. Cnty.*, 497 A.2d 159, 175 (Md. Ct. Spec. App. 1985), *overruled on other grounds*, *Harford Cnty. v. Bel Air*, 704 A.2d 421, 429 n.8 (Md. 1998)).

[13] As to the Defendants' arguments that they are entitled to judgment as a matter of law based on general tort principles of causation and foreseeability, those issues are questions for the jury as well, except to the extent noted in this Memorandum Opinion.

for the court to resolve. *See Dairy Stores, Inc. v. Sentinel Pub. Co.*, 516 A.2d 220, 230 (N.J. 1986) (a matter that involves "substantial government regulation of business activities and products" is a matter of public concern and requires the plaintiff to prove actual malice).

For the same reasons that the Defendants' Motion is denied as to the Maryland law defamation claims, summary judgment is inappropriate as to the claim for defamation under New Jersey law. A commercial truck driver's drug and alcohol screening history is legitimately a matter of public concern and involves significant government regulation of business activities, giving rise to a heightened standard of proof. All the same, when crediting the Plaintiff's version of the facts, a reasonable jury could find by clear and convincing evidence that the Defendants acted with actual malice in making the publication to NFI. Again, the fact that Stefaniak did not himself determine that the Plaintiff refused the drug test or publish the reports is irrelevant because his statements are treated as those of Shared Services under New Jersey law. *See Senna v. Florimont*, 958 A.2d 427, 498-502 (N.J. 2008) (imputing employees' statements to employer when analyzing whether malice standard applied). Therefore, the Defendants' Motion is denied as to the defamation claim under New Jersey law.

### B. Tortious Interference Claims

The Defendants similarly argue that the Plaintiff cannot show the requisite intent to prove his claims for unlawful interference with contract and unlawful interference with prospective economic benefit. Under New Jersey law, both tortious interference with an existing contract and tortious interference with a prospective contractual relationship both require "'malice,' which requires a showing not only that the interference was done

'intentionally,' but also that it was 'without justification or excuse.'" *E. Penn Sanitation, Inc. v. Grinnell Haulers, Inc.*, 682 A.2d 1207, 1219 (N.J. Super. Ct. App. Div. 1996) (citing *Printing Mart-Morristown v. Sharp Elecs. Corp.*, 563 A.2d 31, 37 (N.J. 1989)). Similarly, under Maryland law, interference with a prospective contract must be "done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice)." *Natural Design, Inc. v. Rouse Co.*, 485 A.2d 663, 675 (Md. 1984). In the case of an existing contract, "the circumstances in which a third party has the right to interfere with the performance of that contract are more narrowly restricted." *Macklin v. Robert Logan Assocs.*, 639 A.2d 112, 119 (Md. 1994) (quoting *Natural Design, Inc.*, 485 A.2d at 69-70)).[14] Thus, a plaintiff need not show ill will, but must still show "intentional interference without justification." Restatement (Second) of Torts § 766 cmt. s.

Under any of the applicable standards of intent for Ziemkiewicz's claims for unlawful interference with existing and prospective contractual relations, a genuine issue of material fact prevents the entry of summary judgment. A reasonable jury could conclude that Stefaniak's statements are true, which would defeat the Plaintiff's tortious interference claims. *See* Restatement (Second) of Torts § 772 (1977) ("One who intentionally causes a third person not to perform a contract or not to enter into a prospective contractual relation with another does not interfere improperly with the other's contractual relation, by giving the person truthful information.") (cited by *E. Penn Sanitation, Inc.*, 682 A.2d at 1218). Likewise, a reasonable jury could conclude that Ziemkiewicz's version of events is true and

---

[14] *Macklin* involved a lease terminable at will. The Court of Appeals of Maryland held that such a case is "more closely akin to a situation where no contract exists." 639 A.2d at 118 (citing *Natural Design, Inc.*, 485 A.2d at 69-70). Whether any of Ziemkiewicz's contracts were terminable at will is irrelevant to the resolution of the pending Motions.

determine that the Defendants' intent rose to the level of tortious interference. Accordingly, the Defendants' motion is denied as to the claims in Counts II and III for tortious interference with contractual relations and prospective economic advantage.

### C. Waiver and Release

The Defendants argue that Plaintiff's claims are barred as a matter of law by the affirmative defense of waiver.[15] When applying for employment after resigning from Shared Services, the Plaintiff signed forms releasing former employers from liability for claims arising out of the reporting of drug and alcohol screening records. Under the Regulations, an employer "must not require an employee to sign a consent, release, waiver of liability, or indemnification agreement with respect to any part of the drug or alcohol testing process covered by this part (including, but not limited to, collections, laboratory testing [Medical Review Officers] and [Substance Abuse Professionals] services)." 49 C.F.R. § 40.27. The parties disagree over whether the reporting of a refusal to take a DOT-required test is "part of the testing process" of Part 40 of Title 49 of the Code of Federal Regulations. The only court that has addressed this particular issue[16] held that reporting is part of the testing program and thus claims based on reporting cannot be waived by clauses in job applications. *Clanin v. N. Am. Bulk Transp.*, No. C-3-01-488, 2003 U.S. Dist. LEXIS 4156, at *13-14 (S.D. Ohio Jan. 22, 2003). The United States District Court for the Southern District of Ohio reasoned in the *Clanin* case that because the drug and alcohol testing process described in

---

[15] The Defendants also previously asserted that the Plaintiff's claims are barred by estoppel, but have abandoned that defense. ECF No. 116 2 n.2.

[16] Section 40.27 has been addressed with respect to preemption, as well as in the context of suits against the collector based on the qualifications of the laboratory employee. *See, e.g.*, *Spiker v. Sanjivan, PLLC*, No. CV-13-00334-PHX-GMS, 2013 WL 5200209, at *1 & *6 n.4 (D. Ariz. Sept. 16, 2013).

Part 40 of the Regulations contains requirements concerning record-keeping and verification of an employee's drug and alcohol testing history by the employer, those requirements are part of the testing process "covered by this part." *Id.* Therefore, the court in *Clanin* concluded that waivers with regard to reporting of testing results are void. *Id.*

It is unnecessary to decide in this case whether reporting of a testing refusal is part of the testing process. That is because the claims asserted in this case involve intentional or reckless misconduct, and such claims cannot be waived as a matter of Maryland and New Jersey law.[17] *See Martin Marietta Corp. v. Int'l Telecomms. Satellite Org.*, 978 F.2d 140, 145 (4th Cir. 1992) (quoting *Boucher v. Riner*, 514 A.2d 485, 488 (Md. Ct. Spec. App. 1986) ("A waiver of a right to sue . . . is ineffective to shift the risk of a party's own willful, wanton, reckless, or gross conduct."), *declined to follow on other grounds*, *Wolf v. Ford*, 644 A.2d 522, 527 (Md. 1994)); *Hojnowski v. Vans Skate Park*, 901 A.2d 381, 386 (N.J. 2006) ("It is well settled that to contract in advance to release tort liability resulting from intentional or reckless conduct violates public policy.") (citing Restatement (Second) of Contracts § 195 (1981)); *Stelluti v. Casapenn Enters., LLC*, 975 A.2d 494, 507 (N.J. Super. Ct. App. Div. 2009) (noting that waiver ineffective "at least with respect to acts or omissions by the [defendant] that go beyond ordinary negligence, such as reckless, willful or wanton, or palpably unreasonable behavior." (citing *Hojnowski*, 901 A.2d at 386)). Public policy dictates that a plaintiff cannot prospectively contract to be willfully injured by another in the future. *Wolf*, 644 A.2d at 525; *Hojnowski*, 901 A.2d at 386 (citing Restatement (Second) of Contracts § 195 (1981)). Even in

---

[17] There is no conflict preemption issue here because the state law prohibition on such waivers is not incompatible with the Regulations and would not decrease highway safety. *Specialized Carriers & Rigging Ass'n*, 795 F.2d at 1158.

*Clanin*, upon which Ziemkiewicz relies for the proposition that reporting is part of the testing process, the court recognized that the waiver cannot apply as a matter of state law to claims for reckless, willful, or wanton misconduct. 2003 U.S. Dist. LEXIS 4156, at *15-16 ("Ohio law precludes a party from avoiding future liability on the basis of a release when liability is premised upon intentional, reckless, willful, or wanton misconduct." (citations omitted)).

The releases that the Plaintiff signed when applying for work with prospective employers are contracts that explicitly benefit the Defendants, as Ziemkiewicz's former employer. *See, e.g.*, VE000024-26. As a matter of Maryland and New Jersey law and public policy, Ziemkiewicz could not have waived his claims based on future willful, intentional, or reckless misconduct by the Defendants. Thus, without deciding whether reporting the results of drug and alcohol tests is "part of the testing process" for purposes of the Regulations, the Defendants are barred by well-settled principles of contract law from asserting the affirmative defense of waiver. Therefore, the Defendants' Motion for Summary Judgment based on waiver of the Plaintiff's claims is denied.

### D. Consent

The Defendants also argue that the Plaintiff's claims fail as a matter of law because he consented to the publication of the allegedly false drug and alcohol testing history reports.[18] Under Maryland and New Jersey law, consent is a complete defense to a defamation claim. *McDermott v. Hughley*, 561 A.2d 1038, 1046 (Md. Ct. Spec. App. 1989); *Minerva Marine, Inc. v.*

---

[18] During the teleconference held on October 8, 2013, this Court granted leave to the Defendants to file an Amended Answer that includes the affirmative defense of consent. Letter Order, ECF No. 110.

*Spiliotes*, No. 02-2517, 2006 U.S. Dist. LEXIS 13922, at *107-08 (D.N.J. Mar. 13, 2006). "It is not necessary that the [defamed party] know that the matter to the publication of which he consents is defamatory in character. It is enough that he knows the exact language of the publication or that he has reason to know that it may be defamatory." *McDermott*, 561 A.2d at 1046; *Minerva Marine, Inc.*, 2006 U.S. Dist. LEXIS 13922, at *109 (both quoting Restatement (Second) of Torts § 583 (1977)). In *McDermott*, the Court of Appeals of Maryland observed that "[o]ne who invites the publication knowing that its contents may damage his reputation cannot complain when his fears come true." 561 A.2d at 1046. Similarly, the United States District Court for the District of New Jersey granted summary judgment in favor of the alleged defamer where the defamed gave copies of the allegedly defamatory material to a third party. *Minerva Marine, Inc.*, 2006 U.S. Dist. LEXIS 13922, at *106-11 (quoting *Rogozinski v. Airstream by Angell*, 377 A.2d 807, 816-17 (N.J. Super. Ct. Law. Div. 1977 ("When the publication of defamatory matter has been invited, instigated or procured by one defamed, or by someone acting on his behalf, he generally cannot be heard to complain of the resulting injury, particularly, when it is elicited for the purposes of predicating an action thereon."), *aff'd as modified*, 397 A.2d 334, 335 (N.J. Super. Ct. App. Div. 1979) (crediting defendants for amount of damages mitigated by plaintiff)).

In a case analogous to this one, Judge Hollander of this Court, then of the Court of Special Appeals of Maryland, held that a former employee, who signed consent forms and had knowledge of the substance of what his former employer would say, consented to publication to prospective employers, barring his defamation claim. *Bagwell v. Peninsula Regional Med. Ctr.*, 665 A.2d 297, 316 (Md. Ct. Spec. App. 1995) (affirming grant of summary

judgment on defamation claim where plaintiff consented to former employer giving prior employment information to prospective employers; plaintiff did not show that consent did not extend to any information including subjective perception of disputed events). The consent defense is also applicable to the Plaintiff's claims for unlawful interference with contract and unlawful interference with prospective economic advantage. *Id.* at 313-15.

In this case, there is a genuine issue of material fact as to whether Ziemkiewicz had knowledge of the contents of the allegedly defamatory communications such that he consented to publication.[19] The Defendants argue that Ziemkiewicz had clear notice that Shared Services would not withdraw its determination that he refused a drug screen and that it would report his refusal. The Defendants argue that whether they acted maliciously or with reckless disregard for the truth, the Plaintiff knew exactly what they would report if asked by another prospective employer. Moreover, the Plaintiff did not file a rebuttal to signify to prospective employers that he disputed the refusal determination, as was his right. For his part, the Plaintiff argues that because the Defendants failed to respond to his lawyer's August 2, 2011 letter, he was not apprised on the contents of the drug screen history reports in a manner adequate to consent to their publication. Thus, there are disputes of material fact as to whether Ziemkiewicz consented to and invited publication of the allegedly defamatory statements at issue in this case. Accordingly, the Defendants' Motion for judgment as a matter of law as to their defense of consent is denied.

---

[19] The element of the plaintiff's knowledge before publication distinguishes the consent defense from a defense of a prospective waiver. *Compare Clanin*, 2003 U.S. Dist. LEXIS 4156, at *6 (plaintiff discovered prior testing refusal determination after application was rejected), *with Bagwell*, 665 A.2d at 316 (plaintiff was aware of unfavorable information in his personnel file before applying to prospective employers).

**E. UPS**

The Defendants move for summary judgment on the Plaintiff's claims as they relate to his termination from UPS. The evidence in the record establishes that it was the Plaintiff who showed the June 30, 2011 letter indicating a positive drug test to Michael Schnabel, his supervisor at UPS. The Defendants therefore made no publication to UPS, an essential element of a Maryland defamation claim.[20] *Samuels*, 763 A.2d at 241-42; *see also* Restatement (Second) of Torts § 577 cmt. m (1977) ("One who communicates defamatory matter directly to the defamed person, who himself communicates is to a third person, has not published the matter to a third person if there are no other circumstances."). Moreover, the uncontradicted evidence shows that Ziemkiewicz was fired from UPS for poor performance after multiple warnings. Schnabel testified that the letter from Shared Services had no effect on the Plaintiff's employment. Even in the light most favorable to him, Ziemkiewicz cannot prove that any action by Shared Services caused him to be fired from UPS. Thus, the Defendants cannot, as a matter of law, be held liable for any resulting damages from his termination. *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) (court has an affirmative duty to prevent factually unsupported claims from going to trial). Accordingly, the portions of the Plaintiff's claims arising out of the loss of his employment with UPS are dismissed, and he may not pursue an award of damages based on those allegations.

---

[20] To the extent that the Plaintiff argues that he was compelled to reveal the letter from Shared Services to his employer, the doctrine of self-publication has not been addressed by the Maryland courts, but the Fourth Circuit held that "the Maryland Court of Appeals . . . would not adopt the self-publication theory." *De Leon v. St. Joseph Hosp., Inc.*, 871 F.2d 1229 (4th Cir. 1989); *see also Byington v. NBRS Fin. Bank.*, 903 F. Supp. 2d 342, 353 (D. Md. 2012) (declining to apply self-publication theory, recognizing that *De Leon* is the only controlling precedent on this issue). Accordingly, there has been no publication to UPS for purposes of a defamation claim.

**F. NFI**

The Defendants further argue that Ziemkiewicz cannot establish as a matter of law that any publication of allegedly defamatory information caused him any damage as a result of being terminated from NFI. The record reveals that NFI deemed the Plaintiff to be unqualified for hiring as a driver based on the Defendants' report of his refusal. NFI000054. There is also evidence that NFI discovered the Plaintiff's accident history in his background check, even though Plaintiff failed to report it in his application, and that he was thus ineligible for hiring. The corporate representative of NFI testified that such a falsification would be grounds to disqualify his application. Deposition of Lee Robledo 53, 56, ECF No. 109-19. Still, the allegedly defamatory publication of the drug and alcohol screen could also have been a proximate cause of injury to the Plaintiff under New Jersey law. *Neno v. Clinton*, 772 A.2d 899, 909 (N.J. 2001) (jury instruction as to "the proximate cause" was not erroneous where trial court instructed jury that there may be more than one proximate cause of an injury). The Defendants' argument as to what "would have" happened is unavailing; such speculation does not warrant a grant of summary judgment. Thus, a question of fact remains as to what actually caused Ziemkiewicz not to be hired by NFI. Accordingly, the Defendants' Motion is denied as to the Plaintiff's claims related to NFI.

**G. Black Horse**

The Defendants similarly argue that the Plaintiff cannot as a matter of law show any damages as a result of not being hired by Black Horse were caused by any allegedly defamatory publication at issue. There is also no evidence of the precise reason that the Plaintiff was not offered employment with Black Horse. Deposition of David Schneider 14-

35

15, ECF No. 109-21. Black Horse's corporate representative Schneider testified that Ziemkiewicz's accident history and his failure to accurately report it would have warranted rejection of his application. *Id.* at 65, 48-49. Schneider noted that there was no rebuttal in the file, but that he would have considered any such document. *Id.* at 48-49. Furthermore, Schneider stated that evidence of Ziemkiewicz's termination from another carrier, Old Dominion, with which he was ineligible for rehire, could have caused Black Horse not to hire him. Schneider Dep. 54-55 ("It's a red flag and myself I would move on to another candidate."). Nevertheless, Schneider's testimony as to what he would have done is not sufficient evidence to conclude as a matter of law that the drug and alcohol screen history report did not play a role in preventing the Plaintiff from being hired. The Defendants only argue, perhaps tellingly, that the other information available to Black Horse "likely" would have been disqualified. Defs.' Mem. 14, ECF No. 109-1. In sum, a jury must decide the question of whether any conduct by the Defendants caused any damages with respect to the Plaintiff's application to Black Horse. Accordingly, the Defendants' Motion is denied.

### III.    R+L Carriers, Inc.'s Motion for Summary Judgment

R+L Carriers, Inc. ("Carriers") moves separately for summary judgment on the grounds that it was not the Plaintiff's employer nor did it take any of the actions that form the basis for the Plaintiff's claims.[21] The parties agree that Carriers' liability for the Plaintiff's claims depends on whether there was an agency relationship between Carriers and Shared Services.[22] To find that an agent had actual authority under both Maryland and New Jersey

---

[21] Pursuant to this Court's instruction at the hearing, Carriers submitted a Supplemental Reply, ECF No. 137, addressing the issue of whether an agency relationship existed.
[22] Notably, Ziemkiewicz does not advance an alter ego or veil-piercing theory.

law, the principal must (explicitly or implicitly) actually grant authority to the agent. *Homa v. Friendly Mobile Manor*, 612 A.2d 322, 333 (Md. Ct. Spec. App. 1992); *Licette Music Corp. v. Sills, Cummis, Zuckerman, Radin, Tischman, Epstein & Gross, P.A.*, No. A-6595-06T2, 2009 N.J. Super. Unpub. LEXIS 1861, at *23-25 (N.J. App. Div. Jul. 16, 2009). To support a finding of apparent authority, both Maryland and New Jersey law require a showing that the principal's conduct created the appearance of the agent's authority, causing a third party to reasonably rely on that representation. *Homa*, 612 A.2d at 334-35; *Mayflower Transit, LLC v. Prince*, 314 F. Supp. 2d 362, 374 (D.N.J. 2004).

This Court and the District of New Jersey have both concluded that an agency relationship did not exist between entities with somewhat similar characteristics as Carriers and Shared Services. *See, e.g.*, *Iceland Telecom, Ltd. v. Info. Sys. & Networks Corp.*, 268 F. Supp. 2d 585, 587-88 (D. Md. 2008) (parent and subsidiary corporation shared headquarters and office space, letterhead and non-disclosure agreement stated parent-subsidiary relationship, parent was involved in day-to-day operations of subsidiary, subsidiary's president was paid by parent, plaintiff thought it was dealing with parent); *Gianfredi v. Hilton Hotels Corp., Inc.*, No. 08-5413, 2010 U.S. Dist. LEXIS 33227, at *30 (D.N.J. Apr. 5, 2010) (parent and subsidiary were headquartered in same building and shared office space, parent involved in day-to-day operations of subsidiary, subsidiary's letterhead and non-disclosure agreement indicated parent relationship, subsidiary's president was paid by the parent, plaintiff thought it was dealing with parent). Indeed, the Northern District of California recently concluded that Carriers and Shared Services themselves did not have an agency relationship for purposes of personal jurisdiction. *Hill v. R+L Carriers, Inc.*, No. C 09-01907 CW, 2009 U.S.

Dist. LEXIS 120564, at *8-10 (N.D. Cal. Dec. 7, 2009). Specifically, the court held that Shared Services' undisputed contacts with California could not be imputed to Carriers for purposes of personal jurisdiction because there was no parent-subsidiary relationship, Carriers did not exert pervasive and continual control over Shared Services, and that the two entities' shared directors did not expose Carriers to liability. *Id.*; *see also* Declaration of Daniel J. Brake, ECF No. 128-2.[23]

In this case, Shared Services uses the "R+L® Carriers" brand name, which is nationally recognized as a trucking company. Carriers and Shared Services have the same Chief Executive Officer, President, Vice President, Chief Financial Officer, and Vice President of Legal.[24] Additionally, Shared Services shares a common headquarters, mailing address, and telephone numbers with Carriers. ECF No. 117. The website www.gorlc.com also uses the "R+L® Carriers" trade name. *Id.* Nevertheless, under the analyses in *Iceland Telecom*, *Gianfredi*, and *Hill*, these indicia of corporate control alone are insufficient to conclude that an agency relationship exists.

However, the decisions in *Iceland Telecom*, *Gianfredi*, and *Hill* are distinguishable from the instant case for the simple reason that none of those cases involved a claim of

---

[23] For the reasons stated on the record at the hearing, this Court denied the Plaintiff's Motion to Strike the Brake Declaration and the portions of Carriers' Reply Brief relying on it. *See* Letter Order, ECF No. 135. Additionally, as noted during the hearing, similar declarations submitted by Brake in the case of *Hill v. R+L Carriers, Inc.*, No. C 09-01907 CW, 2009 U.S. Dist. LEXIS 120564 (N.D. Cal. Dec. 7, 2009), are now in the record in this case. ECF Nos. 132-4 and 132-5.

[24] Pursuant to this Court's Order of October 8, 2013, ECF No. 113, the Defendants provided additional information regarding shared directors and officers. The Plaintiff, unsatisfied with the responses provided by the Defendants during this period of additional discovery, moves for further additional discovery pursuant to Rule 56(d). There has been adequate time and opportunity for discovery in this case, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986), and the Plaintiff has not identified specific facts that are yet to be discovered that would justify granting his motion in this regard. *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008). Finding that the information provided by the Defendants is adequate, the Plaintiff's motion pursuant to Rule 56(d) is denied.

defamation based on the very document bearing the logo of the principal entity. Although there are several indicia of Carriers' level of control of Shared Services, the most salient fact is that Carriers granted express permission to use the trade name "R+L® Carriers" on the drug screen history report which is the gravamen of this case.[25] *See* Answers to Interrogatories ¶ 2, Pl.'s Ex. W, ECF No. 117-1. The Plaintiff argues that the CFO of Carriers and Shared Services, Michael Shroyer, verified that Carriers granted Shared Services the authority to use the brand name "R+L® Carriers" and the slogan "One Call - One Carrier" on drug testing history reports. Pl.'s Opp. 2-3, ECF No. 117. Based on this express grant of authority to use the "R+L® Carriers" name in the allegedly defamatory publications, a reasonable finder of fact could conclude that Shared Services had the actual authority to publish drug testing reports on behalf of Carriers. Alternatively, in the absence of actual authority, a reasonable fact finder could conclude that the use of "R+L® Carriers" was a manifestation by Carriers that reasonably appeared to third parties that Shared Services had such authority, and induced reliance by such third parties. For example, there is evidence in the record that other trucking companies referred to the Plaintiff's employer as "R&L Carriers, Inc.," indicating that Carriers' manifestations may have caused others to believe that Shared Services was its agent.[26] Therefore, a genuine issue of material fact

---

[25] The presence or absence of the corporate designation "Inc." is of no moment as to whether the brand name was a manifestation to third parties of Carriers' grant of authority to Shared Services. Additionally, the parties' disagreement as to Carriers' percent ownership of Shared Services and other corporate entities is not material to the resolution of this motion.

[26] The cases cited by Carriers in its Supplemental Reply, ECF No. 137, are distinguishable from the instant case. First, in *The Suarez Corp. v. CBS, Inc.*, 23 F.3d 408 (Table), 1994 U.S. App. LEXIS 9373 (6th Cir. 1994) (per curiam), there was no agency relationship between CBS and a reporter at a CBS affiliate station, acting in a freelance capacity, who broadcast an allegedly defamatory television news report. The Court of Appeals for the Sixth Circuit held that the reporter had no authority to bind CBS, and the only manifestations by CBS—furnishing the reporter with telephone access and

remains as to whether Shared Services acted as Carriers' agent in publishing the letters that form the basis of the Plaintiff's claims. Accordingly, Carriers' Motion for Summary Judgment is denied.

## IV.    Choice of Law on Punitive Damages

As noted, discovery with respect to liability and compensatory damages was bifurcated from punitive damages discovery. Mem. Order, ECF No. 86. Having determined that genuine issues of material fact remain as to liability and compensatory damages, it is now necessary to address the parties' disagreement as to the controlling law on punitive damages.[27] *See* Joint Statement Regarding Choice of Law, ECF No. 91. Because this case was transferred from the District of New Jersey pursuant to 28 U.S.C. § 1404(a), New Jersey choice of law principles govern conflict of laws issues. *See Ferens v. John Deere Co.*, 494 U.S. 516, 530-31 (1990); *Amica Mut. Ins. Co. v. Fogel*, 656 F.3d 167, 170-71 (3d Cir. 2011). Under New Jersey choice of law rules, where there is a conflict in the applicable law, punitive damages may be determined by a different body of law than other issues in the same case, depending on which state's interest is dominant. *Erny v. Estate of Merola*, 792 A.2d 1208, 1213 (N.J. 2002); *P.V. ex rel. T.V. v. Camp Jaycee*, 962 A.2d 453, 460 (N.J. 2008). A conflict exists in the punitive damages laws of the states involved: Maryland does not cap punitive

---

letterhead—were insufficient to create apparent authority. *Id.* at *12. The actual alleged defamation took place on television, and did not concern the use of the letterhead, which he used in researching the story. *Id.* Second, in *Sellify, Inc. v. Amazon.com, Inc.*, No. 09 Civ. 10268, 2010 U.S. Dist. LEXIS 118173, at *8-10 (S.D.N.Y. Nov. 4, 2010), the District Court for the Southern District of New York found no agency relationship where the principal had no control over the purported agent website's advertisements, and the defendant's only manifestation of apparent authority was that the associated website was allowed to link to amazon.com. *Id.* In contrast, the manifestations by Carriers in this case are directly connected to the actual documents that are alleged to have injured the Plaintiff.

[27] Pursuant to this Court's Letter Order of May 21, 2013, ECF No. 85, a period of discovery on punitive damages will be set by separate Order.

damages by statute, *Bowden v. Caldor, Inc.*, 710 A.2d 267, 288 (Md. 1998), while New Jersey

limits punitive damages to the greater of five times the amount of compensatory damages or

$350,000.00, N.J. Stat. § 2A:15-5.14(b). On the other hand, in a case such as this one, Ohio

caps punitive damages at double the amount of compensatory damages.[28]  Ohio Rev. Code

§ 2315.21.

Because a potential award of punitive damages could vary significantly depending

on which state's law controls, it is necessary under New Jersey law to determine which state

has the "most significant relationship with the occurrence and the parties."  Restatement

(Second) of Conflict of Laws (1971); *P.V. ex rel. T.V.*, 962 A.2d at 460.  In tort cases, "The

General Principle" is that:

> The rights and liabilities of the parties with respect to an issue in tort are
> determined by the local law of the state which, with respect to that issue, has
> the most significant relationship to the occurrence and the parties under the
> principles stated in § 6.

Restatement (Second) of Conflict of Laws § 145(1) (1971).  Section 145 further lists specific

"contacts to be taken into account in applying the principles of § 6 to determine the law

applicable to an issue." *Id.* § 145(2).  The section of the Restatement that specifically covers

defamation actions similarly provides:

> In an action for defamation, the local law of the state where the publication
> occurs determines the rights and liabilities of the parties, except as stated in §

---

[28] There are also slight variations in the law of these states in the standard of proof required to recover punitive damages in defamation cases. *Compare Scott v. Jenkins*, 690 A.2d 1000, 1004 n. 5 (Md. 1997) (Maryland law requires clear and convincing evidence of "conduct motivated by ill will, fraud, or other mens rea exhibiting an evil motive or purpose."), *with* N.J. Stat. 2A:15-5.12 (requiring clear and convincing evidence of "actual malice or [ ] a wanton disregard of persons who foreseeably might be harmed").  Any difference is not material to the determination of which state's law should control the issue of punitive damages.

150,[29] unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.

Restatement (Second) of Conflict of Laws § 149.

The parties disagree as to which test should be applied in this case, but as is apparent from the cross-references between Restatement Sections 145 and 149, the inquiry is essentially the same. Both Sections refer to the factors in Section 6, and therefore the "contacts" listed in Section 145(2). *Id.* § 145 cmt. a ("The rule of this Section states a principle applicable to all torts and to all issues in tort and, as a result, is cast in terms of great generality."). Thus, the question of the most significant relationship turns on the analysis of the following factors from Section 6:

> (a) the needs of the interstate and international systems,
>
> (b) the relevant policies of the forum,
>
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
>
> (d) the protection of justified expectations,
>
> (e) the basic policies underlying the particular field of law,
>
> (f) certainty, predictability and uniformity of result, and
>
> (g) ease in the determination and application of the law to be applied.

Restatement § 6. As stated in Section 145(2), the relevant "contacts" that inform the Section 6 analysis are:

> (a) the place where the injury occurred,
>
> (b) the place where the conduct causing the injury occurred,
>
> (c) the domicil, nationality, place of incorporation and place of business of the parties, and

---

[29] Section 150 applies to aggregate communications, wherein a single act such as a news broadcast is published in more than one state. Restatement (Second) of Conflict of Laws § 150. The communications at issue in the instant case are not aggregate communications.

(d) the place where the relationship, if any between the parties is centered.

Restatement § 145(2).

Under any of the above tests, Maryland has the most significant relationship to the parties and facts in this case. The case was transferred from the District of New Jersey to this Court, over the Plaintiff's objections and the Defendants' urging that the case be transferred to Ohio instead. *See* Op. Transferring Case at 9, No. 12-1923 (D.N.J. Feb. 8, 2013), ECF No. 57 ("[T]he events giving rise to the claims here almost all germinated in Maryland where Stefaniak and Plaintiff worked together. The conduct of other R+L employees stemmed from information provided by Stefaniak."). As stated by the District Court for the District of New Jersey, this case centers around the Defendants' place of business in Hagerstown, Maryland, where the relationship between Ziemkiewicz and Shared Services was based. The meeting between Ziemkiewicz and Stefaniak in Hagerstown gave rise to this lawsuit. Although the Defendants discount Stefaniak's conduct because he did not make the refusal determination, his actions are just as significant to the issue of causation of the alleged injury as the actions of Shared Services' employees in Ohio. Moreover, the majority of the publications of allegedly defamatory material were directed to several businesses in Maryland. Despite the Plaintiff's allegations of single publications in New Jersey and Pennsylvania,[30] the relationships of those states are attenuated in comparison with Maryland's clear interests in this case. Thus, applying the law of punitive damages of

---

[30] Ziemkiewicz alleges a publication to Black Horse Carriers in Illinois, but argues that it only resulted in a denial of work in Maryland. *See* Pl.'s Choice of Law Brief 4 & n.1, ECF No. 103 ("Outside of Maryland, Plaintiff claims that Defendants' conduct affected his employment is two other states, New Jersey . . . and Pennsylvania."). Maryland's relationship is strongest as to this claim as well.

Maryland does not offend notions of interstate comity or usurp any significant interest of another state.

Finally, the Defendants argue that because the basic policy of punitive damages is to punish and deter misconduct, Ohio must be the state of dominant interest because the allegedly tortious conduct took place there. This argument fails for two reasons. First, an equally significant portion of the conduct that forms the basis of the claims in this case—Stefaniak's meeting with Ziemkiewicz and subsequent reports to headquarters—took place in Maryland. Second, just as with liability and compensatory damages, the interest in punishing and deterring misconduct may be equally strong in the states where the conduct was directed. Restatement (Second) of Conflict of Laws § 145 cmt. c. Ohio's relationship to this case is not strong enough to overcome Maryland's interest.[31] Accordingly, any punitive damages issues in this case will be governed by Maryland law.

---

[31] There is authority for the proposition that "each communication to a person, other than a communication by the defamer to the person defamed, is considered a separate publication for choice-of-law purposes. It is therefore possible, particularly when the same communication is made to different persons in different states, that each communication by the defamer will be governed by a different law." Restatement § 149 cmt. a. Applying the punitive damages law of each state of publication may support the protection of justified expectations that the publisher would be subject to that state's laws. Nevertheless, in this case, where the relationship between the parties centers so strongly in Maryland, the Defendants could reasonably expect to be bound by Maryland law. Moreover, the interest of judicial economy militates against proceeding in discovery as to punitive damages under the laws of several different states. *See* Restatement § 6(g) ("ease in the determination and application of the law to be applied").

## CONCLUSION

For the reasons stated above, the Plaintiff's Motion for Partial Summary Judgment (ECF No. 104) IS DENIED, Defendant R+L Carriers, Inc.'s Motion for Summary Judgment (ECF No. 108) is DENIED, and Defendant R&L Carriers Shared Services, LLC's Motion for Summary Judgment (ECF No. 109) is DENIED.  In addition, the issue of punitive damages will be governed by Maryland law.

A separate Order follows.


Dated:  February 6, 2014                              _____/s/_____
                                                                        Richard D. Bennett
                                                                        United States District Judge